# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### July 19, 2011 Session

## STATE OF TENNESSEE v. KEVIN L. BUFORD, SR.

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2008B1355     J. Randall Wyatt, Jr., Judge**

---

**No. M2010-01618-CCA-R3-CD - Filed May 24, 2012**

---

The defendant, Kevin L. Buford, Sr., was found guilty after a jury trial of facilitation of felony murder, a Class A felony, and attempted especially aggravated robbery, a Class B felony. On appeal, he raises numerous challenges to his convictions and sentencing, including claims that: (1) the evidence is insufficient to support his convictions; (2) the trial court erred by failing to suppress his pretrial statements to police; (3) his two convictions should have been merged; and (4) the trial court erred at sentencing by finding him to be a Range II offender, by imposing consecutive sentences, and by giving him excessive sentences on both counts. After a careful review of the record and the arguments of the parties, we conclude that the testimony given by one of the defendant's accomplices is sufficient to support his convictions and that this testimony is sufficiently corroborated by other evidence. We conclude that the trial court did not err by denying the defendant's motion to suppress because any police misconduct that may have occurred was unintentional and because the statements the defendant made to police were given after the defendant received repeated *Miranda* warnings and occurred several hours after he was taken into custody. We conclude that double jeopardy principles do not require the merger of the defendant's two convictions because the statutes under which the defendant was convicted include different elements and therefore punish distinct offenses. Finally, after engaging in *de novo* review of the defendant's sentencing, we conclude that the defendant was properly sentenced as a Range II offender, the sentences imposed by the trial court were not excessive, and that the trial court did not err by ordering them to be served consecutively. Consequently, the judgments of the trial court are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR. and D. KELLY THOMAS, JR., JJ., joined.

Dawn Deaner, District Public Defender, and Jeffrey A. DeVasher (on appeal), Jonathan F.

Wing, and Sunny Marie Eaton (at trial), Assistant Public Defenders, for the appellant, Kevin L. Buford, Sr.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; Victor S. (Torry) Johnson, III, District Attorney General; and Kathy Morante and Amy Eisenbeck, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The defendant and four co-defendants (including several members of the defendant's family) were indicted by a grand jury on May 9, 2008, on two counts – felony murder and attempted especially aggravated robbery. The charges against the defendant stemmed from his involvement in the death of the victim, Billy Jack Shane Tudor, who was slain during a botched robbery attempt on January 21, 2008. Prior to the defendant's trial, the defendant moved to suppress pretrial statements he gave to police on the grounds that his first statement resulted from an arrest without probable cause and was made before he was given his *Miranda* warnings, and his subsequent statement resulted from this initial constitutionally-tainted statement.

At an initial hearing on the defendant's motion to suppress, the following evidence was presented:

The State presented the testimony of Sergeant Chris Steele, the lead detective assigned to the victim's murder. Sergeant Steele testified that on January 21, 2008, he arrived at a crime scene on Clarksville Pike. He testified that, by the time he arrived, some witnesses had already given statements to other officers, and that he spoke to another witness by telephone. Sergeant Steele testified that based on the information he received from these witnesses, he was able to conclude that these witnesses heard several shots fired, and then saw several individuals enter a vehicle. Sergeant Steele was informed that this vehicle was a gold sports utility vehicle ("SUV") and was given a complete license tag number. Sergeant Steele testified that patrol officers on the scene had already searched computer records using the gold SUV's license tag number and discovered the names of the owners of the vehicle – the defendant and his wife.

Sergeant Steele testified that he directed other officers to go to the defendant's house and place it under surveillance. When those officers arrived, a gold SUV matching the license tag number given to the officers was parked in front of the defendant's house. A short time later, the officers watching the defendant's house contacted Sergeant Steele and told him that a male and female had left the house and gotten into two separate vehicles,

neither of which was the gold SUV.  Sergeant Steele had the officers follow the vehicles.

When Sergeant Steele was informed that both of the vehicles had driven a short distance and pulled into a McDonald's, Sergeant Steele requested the officers to pull both vehicles over and perform an investigative stop.  Sergeant Steele testified that he did not intend to arrest either of the vehicles' occupants at that time, but rather merely wanted to determine the identities of the drivers.  Sergeant Steele testified that he drove directly from the crime scene to the McDonald's parking lot and arrived about fifteen or twenty minutes later.  He testified that when he arrived, the defendant and his wife were at the scene and had been detained.  Sergeant Steele testified that Lieutenant Mackall was the officer in charge of the scene, and that several other patrol officers were also present.

Sergeant Steele testified that when he arrived the defendant was sitting in the back of a police car in the McDonald's parking lot.  He testified that the door to the police car was open and an officer was standing beside the defendant.  Sergeant Steele testified that the defendant's wife was also in a patrol car.  He testified that he did not believe that the defendant was handcuffed.  Sergeant Steele testified that he spoke to the defendant's wife first, informed her of her *Miranda* rights, and asked her who owned the gold SUV.  The defendant's wife told him that she and the defendant owned it.  Sergeant Steele testified that he asked the defendant's wife if she had driven the SUV on that day, and she responded that she had not.  The defendant's wife further stated that no one other than her and her husband ever had control over or drove their SUV.

Sergeant Steele then went to another patrol car to speak with the defendant.  Sergeant Steele testified that after he gave the defendant his *Miranda* warnings, the defendant told him that he had been driving the SUV that day and that no one else had ever been in control of the vehicle.  He testified that he asked the defendant if anyone else was with him during the day, and the defendant initially told him no.  However, later in the conversation, the defendant stated that his son D'Angelo Buford had been with him.  Sergeant Steele continued to talk with the defendant and asked him if he would be willing to go to the police station to give an interview on tape.  Sergeant Steele testified that defendant was not under arrest but was taken to the police station, where he was again given his *Miranda* warnings and made a further statement.

During his interview at the police station, the defendant again stated that he was the only one driving the SUV and that his son D'Angelo was the only one with him.  The defendant stated that while he was parked at a gas station, he heard some gunshots, and then a couple of kids suddenly ran from a nearby car wash area and jumped into his vehicle.  Sergeant Steele testified that defendant stated that these kids offered him a couple of dollars if he would drive them to the Hines Park area and drop them off.  Sergeant Steele testified

that defendant told him that he had complied with their request. Sergeant Steele testified that the defendant initially stated that he did not know the identities of these kids. Later, however, the defendant stated that one might go by the name "Ray" and the other might go by the name "Mac 10." Sergeant Steele testified that he was able to determine through further investigation that "Ray" was the street name of the defendant's codefendant Raymond Pirtle, and that "Mac 10" was the street name of another one of the defendant's sons (also a co-defendant). Sergeant Steele testified that after he finished interviewing the defendant, the defendant was released. The defendant was indicted several days later.

On cross-examination, Officer Steele testified that he arrived at the McDonald's at approximately 7 p.m., which was approximately an hour after the shooting. He clarified that one of the primary witnesses he spoke to was Ms. Donna Jones. He testified that Ms. Jones told him that she and her son had been walking out of a store when they heard a loud noise that she thought might have been a gunshot. He testified that she stated that she immediately grabbed her son went back into the store, and a short time afterward she saw three young black males running in her direction. She saw these black males get into an SUV and wrote down the license plate number. Sergeant Steele testified that Ms. Jones told him that she did not see any of the men holding guns and did not see anyone in or around the SUV doing anything illegal.

Sergeant Steele further testified that the defendant and his wife were not allowed to speak to anyone while they were in the patrol cars. He testified that at one point while he was questioning the defendant he stated "we dragged you around a lot tonight, thanks for bearing with us." Sergeant Steele testified that the defendant did not sign a written *Miranda* waiver until after he arrived at the police station. Sergeant Steele testified that the defendant was questioned for a long time and was not released until the following morning. Sergeant Steele testified that the defendant was not given the option of making an appointment to speak with police at a later point in time.

Following Sergeant Steele's testimony, the defense presented the testimony of the defendant's wife, Ms. Tiffany Buford. The defendant's wife testified that on the night in question she, her husband, and her brother decided to go to McDonald's. She testified that she and her husband were in one car and her brother was in another car. When she arrived at the McDonald's, her brother had already been pulled over by police. She testified that she saw police lights behind her, and when she pulled over, several police officers came over to the car and told her to put her hands up and step out of the vehicle. She testified that there were between ten to fifteen police officers there and that they had their weapons out and were speaking in a loud tone of voice. She testified that the officers escorted her over to the sidewalk, and afterward she saw them get her husband out of the car, pat him down, and handcuff him before taking him to a police car. She testified that she did not remember

whether any of the officers had touched her at any point, but she knew that she was asked to sit in the back of a different police car and she complied with this request. She testified that a detective came over to talk to her. She testified that afterward she was taken back to her house, where the gold SUV was parked, and was asked to step outside and stand nearby while the police searched the SUV. The defendant's wife testified that the defendant remained in the back of a patrol car throughout this time. The defendant's wife testified that after the police officers finished searching the SUV, she went inside with them while they searched the house. The defendant's wife testified that she did not feel like she was free to leave at any point during the evening.

On cross-examination, the defendant's wife testified that her husband dropped her off and picked her up from work that day in the gold SUV. She testified that the house where she and her husband lived was owned by her parents, who lived there along with her brother. She testified that about twenty minutes after she got home from work on the day in question she and her husband left to go to McDonald's. She testified that after returning her to her house, the police asked for her consent to search the SUV and her parents' house. Both she and her parents gave consent for these searches. She testified that after the police finished with these searches they left, and she stayed at the house while her husband went to the police station. She testified that her brother was released after he was stopped in the McDonald's parking lot, and that he arrived at their house sometime later. She testified that she believed that her husband received a ride home from the police the following morning.

The next witness for the defense was Mr. Eric Whittemore, the defendant's wife's brother. He testified that he was on his way to McDonald's to meet his sister when he saw several police vehicles. He testified that when he turned into the McDonald's parking lot, police officers turned on their blue lights and boxed him in. He testified that approximately ten police officers approached his vehicle. These officers told him to put his hands out of the car and open the door. When he got out of his vehicle the police officers searched him. Afterward, they put him in the back seat of a police car. He testified that he was detained by the police for a couple of hours in all and that he was not under the impression that he could leave at any point.

On cross-examination, the defendant's wife's brother testified that he did not ask to leave at any point. He also testified that he was not informed that the police were investigating a murder until after he arrived back at his house.

Following this testimony, the trial court stated that it wanted to take testimony from Lieutenant Mackall, the officer in charge of the scene during the stop at the McDonald's parking lot, who was out of state and had been unavailable as a witness. Proceedings were continued while the State checked on his availability. At a further hearing on the defendant's

motion to suppress held on November 9, 2009, the trial court heard testimony from Lieutenant Mackall and additional testimony from Sergeant Steele.

Lieutenant Mackall testified that he had been unavailable to testify at the prior hearing because he was in Quantico, Virginia at the FBI National Academy. He testified that he was the officer in charge of the vehicular stops that occurred in the McDonald's parking lot on the day of the victim's homicide. He testified that prior to conducting the stops he was in touch with Detective Steele over the radio. He testified that a license tag number that he had researched in conjunction with Detective Steele's investigation had come back with an address on Neely's Bend Road. He testified that he dispatched officers to that address to conduct surveillance. He testified that the officers on the scene told him that there were two vehicles at that location, and that while they were watching one of these vehicles left. He testified that he gave this information to Detective Steele and Detective Steele requested that he stop the vehicle.

Lieutenant Mackall testified that he ordered police officers to stop the vehicle. He testified that the white female driver of that vehicle pulled into a McDonald's parking lot and was in the drive-through line when his officers pulled in behind her. Lieutenant Mackall testified that he was not present when this vehicle was stopped, but that he arrived later and observed that the vehicle was still in the drive-through line. Lieutenant Mackall testified that he when he arrived the driver was standing outside of her vehicle, and she was not handcuffed. He testified that none of the police officers had their weapons drawn when he arrived. Lieutenant Mackall testified that he asked the female her name but did not ask her any substantive questions about what she had been doing that night.

Lieutenant Mackall testified that he was then informed that a second vehicle had left the house on Neely Bend Road, and that it was being driven by a white male. He was informed the vehicle, a truck, was traveling in the same direction, so he told his officers to wait before they stopped it. Lieutenant Mackall testified that once the vehicle got close to the McDonald's, the officers activated their blue lights and pulled the truck over into the McDonald's parking lot. Lieutenant Mackall testified that none of the police officers present at the scene had their guns drawn. He testified that he approached the second vehicle from the front and asked the driver to step outside. He testified that he asked the gentleman if he had "anything" on him, and the individual said no. He testified that he asked the individual if he minded if the police patted him down. He testified that the individual said no.

Next, Lieutenant Mackall testified that he patted down the defendant, and another officer patted down the white male driver. Responding to a question from the court, Lieutenant Mackall specifically testified that the defendant was a passenger in the second vehicle (the one driven by the white male), and that both the defendant and the white male

were standing together at some point. When he was informed that there had been some earlier testimony by an individual to the effect that guns had been drawn, Lieutenant Mackall responded that he was not there for the first vehicle stop (which according to his testimony involved only the white female), but that when the second vehicle was stopped he did not have his weapon out and he did not see anyone else with their weapon out. Lieutenant Mackall testified that at no point did either the driver or the passenger of the second vehicle state that he wanted to leave, that he wanted a lawyer, or that he did not want to be searched. Lieutenant Mackall testified that he was not involved in questioning any of the individuals, and he left the parking lot before any of the individuals who had been detained.

On cross examination, Lieutenant Mackall testified that he did not make a report of the incident and that he was working off his memory with respect to these events, which had happened almost two years before. Lieutenant Mackall testified that he made it clear to the officers involved that he wanted the two vehicles at issue stopped and that he was sure that the officers had taken the stops seriously. He testified that when he arrived at the scene there were several marked patrol cars present, but that they did not have their lights activated. He testified that he would dispute any testimony that the defendant and his wife were together in the first vehicle that had been stopped – he clearly remembered the defendant being in the passenger side of the second vehicle. He testified that he detained the defendant until Detective Steele arrived.

Following this testimony, which was considered part of the State's initial proof, Sergeant Steele took the stand on behalf of the State in rebuttal. He testified that when he arrived at the scene, no one was in handcuffs, none of the officers had their weapons drawn, and that neither the defendant nor his wife ever indicated that they did not want to talk to him. He testified that he did not tell them they were under arrest, that he read them their *Miranda* rights only because of the seriousness of the offenses that were under investigation, and that he explained to them why he was speaking to them. Sergeant Steele also stated that he only spoke with the defendant outside of the McDonald's and again at the police station; there were no statements made in between those two points of time that might be introduced into evidence.

On cross-examination, Sergeant Steele stated that there were no witnesses to the actual shooting, only witnesses who stated that a gold SUV with a specific tag number was seen leaving the area. He testified that when he asked for the two vehicles to be pulled over for an investigative stop, he was aware that these vehicles, which were leaving the residence where the suspect vehicle was located, were not themselves the suspect vehicle. Sergeant Steele testified that there was an officer with the defendant from the time he was stopped until the time the defendant left the police station, and he testified that the defendant remained in continuous police control throughout this time. He testified that all three of the

detained individuals were kept separate from each other for investigative purposes.

Following this testimony, the trial court heard oral argument concerning the defendant's motion to suppress. The State generally argued that the officers had performed a mere investigative stop and that they had the "reasonable suspicion" necessary to do so. The State further claimed that the defendant voluntarily participated in the investigation that followed. Even if the initial stop was unreasonable, the State argued, there were no unlawful fruits flowing from it, as the defendant was given his *Miranda* warnings and executed a written *Miranda* waiver when he arrived at the police station. On the other hand, the defendant argued that he was unlawfully arrested without probable cause in the McDonald's parking lot, and because of the short span of time that had passed between that unlawful arrest and his questioning at the police station and lack of any intervening circumstances, the statement given by the defendant at the police station was the fruit of this unlawful arrest. After hearing these arguments, the trial court requested additional briefing.

On December 9, 2009, the trial court issued a written order denying the defendant's motion to suppress. The trial court found that the defendant had been seized in the McDonald's parking lot, reasoning that a reasonable individual would not have felt free to leave under the circumstances. The trial court found that this seizure was initially justifiable as a valid investigative stop because the police had a reasonable suspicion that the occupants of the vehicle may have been involved in a homicide. Consequently, the police were entitled to briefly detain the defendant and interview him about the shooting (and the law did not require the suppression of any statements he made to police at this time).

However, the trial court further reasoned that investigative stops must be temporary and made only for a limited purpose. While the defendant's initial detention was justified as a investigative stop, his continued detention over a period of many hours, and his transport in the back of a police cruiser, first to his house, and then to the police station, "restrained the Defendant to such a degree as to be more associated with a formal arrest, even if he was not formally charged at th[at] point." The trial court held that this *de facto* arrest of the defendant was illegal because it was not supported by probable cause. However, the trial court held that the defendant's statements to the police made back at the police station should not be suppressed because they were sufficiently voluntary so as to be purged of any taint associated with the defendant's prior seizure without probable cause. In reaching this conclusion, the trial court relied on several factors, including the facts that: (1) the police repeatedly gave the defendant his *Miranda* warnings; (2) the police did not intend to secure a confession from the defendant when they took him to the station; and (3) considerable time passed between the defendant's unlawful arrest and his subsequent statements to police back at the station.

The defendant was tried before a jury on February 8-12, 2008. At his trial, the following evidence was presented:

The first witness for the state was Mrs. Janice Tuders, the victim's mother. She testified that her son was employed at a lubrication shop and car wash on Clarksville Highway. She testified that at the time of his death the victim was building an additional building beside the car wash, and that he had been doing so for about six months. She testified that her son was paid in cash each day for his work. She testified that almost every evening her son would go to a market next to the car wash to buy cigarettes.

The State's second witness was Officer Byron Boelter of the Metropolitan Nashville Police Department. Officer Boelter testified that he was working as a patrol officer on the day in question, and that he received call to go to a location on Clarksville Highway because an individual had been shot at a car wash. He testified that he was the first officer on the scene. He testified that when he arrived, he saw a white male, dressed in all black, lying face down about fifty yards from the car wash. Officer Boelter testified that this individual was not breathing, his eyes were glassed over, and he had blood coming out of his mouth. Officer Boelter testified that medical personnel arrived shortly afterward. When the medical personnel rolled the victim onto his back and opened his shirt, Officer Boelter saw a small hole in the victim's chest that he believed was consistent with a gunshot wound. Officer Boelter testified that he secured the crime scene after the victim was transported to Vanderbilt hospital.

On cross-examination, Officer Boelter testified that when he arrived at the crime scene, the gas station next to the car wash and the market across the street from the car wash were still open. He testified that there was probably a good amount of traffic on the road at that time of day. He further testified that at least two of the nearby businesses had security cameras.

The State's next witness was Officer Eric Richardson of the Metropolitan Nashville Police Department. He testified that he was working patrol on the day in question and was one of the first police officers to arrive at the crime scene. He testified that he secured the crime scene and then searched the area for evidence. He testified that he found a shell casing near the car wash, and a picture of this item was entered in the evidence.

Following this testimony, the State presented Detective Norris Tarkington of the Metropolitan Nashville Police Department. Detective Tarkington stated that he went to the crime scene on the night in question to assist the investigating detectives. He testified that he did a walk-through of the crime scene, and while doing so he found a spent shell casing on the ground near the front door of the car wash. He also found a folded twenty dollar bill

and a lottery ticket on the ground just to the left of the shell casing. Pictures of these items were entered into evidence, along with some pictures of blood spatter and blood trails leading toward the car wash. On cross-examination, Detective Tarkington testified that there was considerable traffic on the nearby highway, and there was at least one surveillance camera located in the nearby parking lot.

The State's next witnesses were Donna and Darnell Jones, the mother and son who had been shopping at a nearby grocery store and who had called the police to report hearing gunshots. These witnesses testified that they had just finished shopping at the grocery store and were walking out when they suddenly heard gunshots. They rushed back inside, and soon thereafter they saw three black men run past the front of the market and get into an SUV, which immediately drove away. Darnell Jones testified that he took down the license plate number of this SUV. In addition, he testified that during the ensuing police investigation he was shown several photo lineups containing multiple individuals and that he identified two individuals from those lineups as being two of the persons that he saw running away that day.

The State's next witness was Mr. Raymond Pirtle, one of the defendant's codefendants. Mr. Pirtle testified that he had been a friend of the defendant's sons, D'Angelo Buford and Kevin Buford Junior, for many years but that he met the defendant for the first time on the day of the shooting. Mr. Pirtle testified that some weeks before the incident, he had bought a gun "off the streets" for his own protection. This gun was a 9mm Smith & Wesson. Mr. Pirtle testified that about three weeks before the incident, he gave this gun to D'Angelo Buford and Kevin Buford Junior, after they had asked him to borrow it. He testified that on the day of the incident, Kevin Buford Junior came to his house and asked him if he wanted to commit a robbery. Mr. Pirtle replied that he did. When he went outside, the defendant and D'Angelo Buford were also present, waiting for him in a gold SUV. Mr. Pirtle testified that the defendant was driving the vehicle. Mr. Pirtle testified that after he got inside the SUV, all four of them drove to a Burger King. He testified that at some point during this drive he heard D'Angelo Buford cock a gun.

When they arrived at the Burger King, the defendant told Mr. Pirtle that a friend of his had told him about a car lot that they could rob. Mr. Pirtle testified that the defendant told the other three to act as if they wanted to buy a car, and then, when the owner let them in, to rob him. Mr. Pirtle testified that he, Kevin Buford Junior, and D'Angelo Buford all got out of the SUV to rob the car lot, and he saw D'Angelo Buford carrying a gun at that time. He testified that as they approached the car lot, he told Kevin Buford Junior and D'Angelo Buford that he had a bad feeling. They appeared to agree, and after about three minutes all the three of them went back to the SUV. Mr. Pirtle testified that after they got back into the SUV, the defendant continued to urge them to rob the car lot, describing various methods the

three might use to get in. He testified that the three of them did not respond, and the defendant got angry and sped away.

Next, Mr. Pirtle testified that the defendant drove them to an Auto Zone, and told them to wait in the SUV while he went inside to see if there were any surveillance cameras. Mr. Pirtle testified that the defendant returned about five minutes later and drove away from the Auto Zone. During this drive, the defendant made a phone call to someone and asked the person on the other end of the call about robbing some white guy. Then the defendant pulled into a gas station. The defendant told the rest of the group that they did not have enough money to buy gas to return home, and he appeared unhappy about the situation. Mr. Pirtle testified that the group then left to go pick up some marijuana from one of Mr. Pirtle's friends, known by the street moniker "Little E," who lived in some nearby apartments. He testified that he got out of the SUV alone, went to his friend's house, and bought twenty dollars worth of marijuana.

Following this, the group drove to pick up Robert Buford, the defendant's brother, from his workplace. After picking him up, the defendant drove all five individuals to a liquor store on Jefferson Street for the purpose of robbing one of the many people frequenting a nearby business. Mr. Pirtle testified that the defendant told the group that he knew "a place where a lot of Mexicans cash their checks," and that he suggested that they all stay in front of the liquor store, pretending to drink liquor. Mr. Pirtle testified that the defendant told the group that he was going to tell them which individual to rob after he watched them cash their checks. Mr. Pirtle testified that the defendant went into the liquor store and purchased some vodka, which was sampled by the entire group. Mr. Pirtle testified that the group had been waiting for about thirty minutes when the defendant stated that a woman who was cashing her check was about to come out and instructed him, D'Angelo Buford, and Kevin Buford Junior to rob her. Mr. Pirtle testified that when this woman came out of the store, the three of them told the defendant that they were not going to rob her, and the defendant drove away.

After the group left, various members put forward different suggestions concerning the next place they should go to commit a robbery. Mr. Pirtle testified that eventually the defendant told his son D'Angelo to call back "Little E" and request to buy some additional marijuana so that the group could rob him. D'Angelo did so. Mr. Pirtle testified that the defendant drove to a prearranged meeting location near a convenience store, and that Robert Buford got out of the SUV carrying a gun. According to Mr. Pirtle's testimony, the plan was to allow "Little E" to approach the SUV, and then Robert Buford (whom the dealer had not met) would come from behind and rob him – thereby fooling the dealer into believing that he had been robbed by a random person. Mr. Pirtle testified that the group executed this robbery as planned. Afterward, the defendant drove the SUV a short distance away and picked up Robert Buford, who now had marijuana and some money.

-11-

Following this robbery, Mr. Pirtle testified that the defendant drove the group down Clarksville highway. Mr. Pirtle testified that the defendant then calmly told the group "now I got 15 minutes to do a robbery before I go and pick up my wife from work." Mr. Pirtle testified that at that point Kevin Buford Junior started acting "hyped up" – talking louder than normal and "swaggering." Mr. Pirtle testified that D'Angelo Buford tried to calm Kevin Buford Junior down, but the defendant discouraged his efforts. Mr. Pirtle testified that the defendant pulled into a car wash on Clarksville highway and parked the SUV. Mr. Pirtle testified that they saw the victim walking by, and the defendant stated that the victim looked like he had some money. Mr. Pirtle testified that the defendant told the others to go rob him. After the victim walked past the SUV, Kevin Buford Junior and Robert Buford got out of the car and followed him. Mr. Pirtle testified that Robert Buford had the gun with him at this time. Mr. Pirtle testified that he also got out of the SUV and followed the other two to assist them.

Mr. Pirtle testified that the victim walked into a grocery store, and they waited for him to come out. Mr. Pirtle testified that when the victim walked out of the store, Kevin Buford Junior ran over and hit the victim in the head with a gun. Mr. Pirtle testified that the victim turned around and swung at Kevin Buford Junior, and then Kevin Buford Junior shot the victim. The victim ran toward the nearby car wash. Mr. Pirtle testified that he, Kevin Buford Junior, and Robert Buford all got back into the SUV, and then the defendant drove them away.

Mr. Pirtle testified that during this car ride, the group was yelling at Kevin Buford Junior for shooting the victim. Mr. Pirtle testified that Kevin Buford Junior responded "he hit me, I did not know what to do." The defendant drove D'Angelo Buford and Kevin Buford Junior home. After dropping them off, the defendant drove Mr. Pirtle to a small market. Mr. Pirtle testified that he gave the defendant five dollars, and the defendant went into the store and bought him a cigarillo so that he could smoke the rest of his marijuana. The defendant then drove Mr. Pirtle home. Mr. Pirtle testified that when he left, the defendant and Robert Buford were still in the front seat of the SUV.

Mr. Pirtle testified that the police came to his house and arrested him the next morning. He testified that the police requested to search his house for the gun, and he gave them permission to do so. Mr. Pirtle testified that he did not have the gun at that time, and the last time he saw it, it was in D'Angelo Buford's possession as he was being dropped off after the shooting.

Mr. Pirtle testified that he was taken back to the police station, where he generally told police the truth about what happened on the day of the shooting – although he admitted that he did not tell them every single detail because he did not want to get himself into more

trouble. He testified that he had not been offered anything from the State in return for his testimony, but he was hoping for some sort of leniency. He testified that he had been in trouble at school, and sometimes suspended, for cutting classes, fighting, and possessing a weapon. In conclusion, Mr. Pirtle testified that the defendant was the person who had directed all of the various participants to do the various robberies on the day in question, including the attempted robbery of the victim.

On cross examination, Mr. Pirtle acknowledged that he was presently charged with first degree murder, that the penalty for first degree murder was life in prison, and that he understood that a sentence of life in prison required him to serve at least fifty-one calendar years. He admitted that while he had no deal with the prosecution, he was aware that some of the people prosecuting the defendant would also be deciding whether he received a deal and that he was in fact hoping to receive a deal.

Mr. Pirtle also admitted that in January of 2008, he was a member of the Gangster Disciples and was living a "gangbanger's life." He admitted that he willingly joined Kevin Buford Junior, D'Angelo Buford, and the defendant on the day in question for the purpose of committing robberies, and he was a willing participant in the robbery and attempted robberies that were committed that day. He admitted that he had been previously arrested, that he had been disciplined at school on numerous occasions, and that he had been disciplined while in police custody for committing various criminal and antisocial acts. Mr. Pirtle also discussed some specific instances of the misbehavior that had resulted in his receiving this discipline. He claimed to have left the Gangster Disciplines the year before, and he testified that he would not lie to protect his former gang members.

Mr. Pirtle testified that the defendant never held the gun on the day of the robberies. He testified that he never saw Kevin Buford Junior tell the victim to give him any money and never saw the victim give anything to him. He testified that Kevin Buford Junior did not get anything from the victim. He testified that the defendant did not know that anyone had been shot until the group returned to the SUV after the shooting.

Mr. Pirtle testified that although he had smoked marihuana and drunk vodka on the day of the robberies, this combination had not made it difficult for him to remember events as they happened that day. He admitted that he had probably told a doctor something to the contrary – that he had "blacked out" on the day in question – during his mental health evaluation but offered no explanation for why he had done so. Defense counsel also impeached Mr. Pirtle with numerous prior statements he had made – both to police during the investigation and under oath at an earlier hearing – that were inconsistent with his trial testimony. Mr. Pirtle testified that he did not know why the defendant had stated that the group did not have enough money for gas to return home, given that the defendant had

enough money to purchase vodka at the liquor store and that the defendant had driven them home after the shooting without filling up the SUV.

On redirect examination, Mr. Pirtle pointed out that the drug dealer the group had robbed on the day of the shooting was a fellow Gangster Disciples member. Mr. Pirtle also testified that D'Angelo Buford and Kevin Buford Junior were members of the Gangster Disciples. Mr. Pirtle explained that when he was answering questions posed by his doctor and the police, he was not under oath, as he was when he gave his direct testimony. Next, the prosecutor went over statements made by Mr. Pirtle at the earlier hearing in detail and generally attempted to explain away the apparent inconsistencies – partly on the basis that Mr. Pirtle's testimony at the earlier hearing was much more brief and less detailed. The prosecutor also emphasized the numerous statements made by Mr. Pirtle during his direct testimony that were consistent with his earlier testimony.

Following Mr. Pirtle's testimony, the defendant's wife's supervisor from the daycare center where she had worked in 2008 took the stand. The defendant's wife's supervisor testified that the defendant generally dropped off and picked up his wife from work. She testified that when he did so the defendant drove an SUV. The supervisor testified that on the night in question, the defendant's wife was scheduled to get off work at 6:30 p.m. The supervisor testified that the defendant picked her up slightly later than usual.

Following this testimony, Detective Harold Haney of the Nashville Metropolitan Police Department took the stand. He testified that he had retrieved video footage from a surveillance system at a nearby express lubrication facility after the crime. He identified a DVD he had created containing a copy of this video, which was entered in the evidence and played for the jury.

The video depicts a parking lot in the foreground with a car wash running lengthwise in the background. Roughly seven and half minutes into this video, an individual can be seen walking from an area off-screen behind the car wash, through the car wash itself, and then through the parking lot before finally walking off the bottom of the screen on the left hand side. Approximately twenty seconds later, two other individuals can be seen walking behind the length of the car wash, then following roughly the same path as the first individual through the car wash itself and down through the parking lot. One of these two individuals appears to stagger – as if laughing or intoxicated – while the pair are in the parking lot before they also disappear off the bottom of the left hand side of the screen. A few seconds later, a fourth individual walks through a car wash bay and walks off the right hand side of the screen.

Approximately a minute later, the video shows an individual walking up from the

-14-

bottom left hand side of the screen through the parking lot, traversing approximately the same path taken by the first three individuals, discussed above, but in reverse. A second individual walks close behind the first one. Midway through the parking lot, the second individual appears to hit the first individual in the head from behind. As the first individual tries to run away, the second individual appears to point an object at the first individual and shoot him. The first individual staggers, and then runs through the car wash and off the right hand side of the screen. The third individual runs along the same route from the bottom of the screen and joins the second individual, and then the pair run toward the car wash before suddenly turning left and running off the left hand side of the screen. This entire series of events takes place in less than fifteen seconds.

After showing this video, the State called Detective Rob Hansen of the Metropolitan Nashville Police Department, who testified that he assisted the lead detective on the case by showing three photographic lineups to witnesses Donna Jones and Donnell Jones. He testified that each lineup consisted of six photographs, which were matched by demographics, hair and skin tone. He testified that he prepared and showed the witnesses these lineups – one including the defendant, one including Kevin Buford Junior, and one including D'Angelo Buford. He testified that Donna Jones was unable to make any identification from these lineups, but that Donnell Jones was able to identify Kevin Buford Junior. He testified that he was aware that Donnell Jones also identified Mr. Raymond Pirtle from an additional lineup that he did not administer. Detective Hansen testified that he went with other officers to Raymond Pirtle's house to arrest him. When they arrived, they received permission from Mr. Pirtle's aunt to search the house for a gun. He testified that they did not find anything during their search of the house. On cross-examination, Detective Hanson clarified that no witness had identified the defendant from a lineup.

The State's next witness was Ms. Jenness Schuhnann, who worked as a crime scene technician for the Nashville Metropolitan Police Department on the night in question. Ms. Schuhnann testified that she processed the crime scene on Clarksville Pike where the victim was killed and that she took photographs and collected evidence there. She identified items she had collected from various sealed evidence bags – including a twenty dollar bill, a lottery ticket, a knit cap, and some shell casings – and these items were entered into evidence. Ms. Schuhnann explained where these items were found at the crime scene, and she identified photographs she had taken of them *in situ*. She also identified additional photographs she had taken of the crime scene, including photographs of the car wash and nearby buildings that showed different perspectives.

The State also called Dr. Kovach, a clinical psychologist at the Middle Tennessee Health Institute in Nashville who had performed a mental health evaluation of Mr. Raymond Pirtle. Dr. Kovach testified that the purpose of his evaluation was to determine whether Mr.

Pirtle needed to be committed. Following the evaluation, he concluded that commitment was not necessary. In conjunction with this evaluation, the doctor testified that he performed a brief interview with Mr. Pirtle concerning the events that had occurred on the day of the shooting. Dr. Kovach testified that Mr. Pirtle told him that he was in a car with his friend and that he heard his friend's father say "go get him" before the murder was committed.

On cross-examination, Dr. Kovach stated that Mr. Pirtle told him during the interview that he was innocent, that he had never belonged to a gang, that he had robbed someone two or three times before, and that he had blacked out on the day in question due to his heavy consumption of alcohol. The doctor also testified that his notes did not reflect that Mr. Pirtle had ever told him that the group had attempted other robberies on that day or that the defendant had ever told him "we have fifteen minutes to do a robbery."

Next, the State called Mr. Johnny Lawrence of the Nashville Metropolitan Police Department, who worked with Ms. Schuhnann as a crime scene technician on the night in question. He testified that he examined and tested an SUV for fingerprints and was able to recover several sets, which were sent back to the crime lab for identification. These prints were entered into evidence.

The following day, the State called Ms. Lorita Marsh, an identification analyst at the Metropolitan Nashville Police Department who was qualified as an expert in the field of latent print examination. She testified that she had examined certain fingerprints that were lifted by Mr. Johnny Lawrence from the doors and handles of the SUV after the shooting. She testified that after analyzing these prints she was able to conclude that four of the prints matched Robert Buford, two prints belonged to Kevin L. Buford, and seven prints belonged to Mr. Raymond Pirtle.

The State also presented the testimony of Sergeant Chris Steele. Detective Steele again testified that he was the lead detective in the case involving the victim's shooting. Detective Steele went over various crime scene diagrams with the jury and discussed the location of the victim's body and other evidence. He also discussed how he (1) interviewed Donnell and Donna Jones, (2) received and ran the license tag of the gold SUV, (3) came to order the defendant's vehicle to be stopped, and (4) interviewed the defendant following this stop – all in a manner that was consistent with his testimony at the hearing on the defendant's motion to suppress. Following this testimony, a videotape of the defendant's tape recorded interview at the police station was played for the jury. While questioning the witness concerning this interview, the prosecutor emphasized portions of the tape where the defendant initially admitted that someone named "Mac 10" had been in the SUV with him earlier in the day, and later claimed that someone named "Little E" had gotten in the car with him. Detective Steele testified that he later determined that "Mac 10" was the street name

of the defendant's son, Kevin Buford Junior, and that he never identified anyone named "Little E." Detective Steele testified that the defendant was released following this interview. Detective Steele testified that the defendant was later indicted and arrested (on February 1, 2008), and that following his arrest he was interviewed again. A videotape of this interview was also played for the jury.

On cross-examination, Detective Steele testified that the defendant had been honest during his interview when he (1) placed himself in the SUV on the day in question, (2) told him that he was driving it, and (3) admitted that his son D'Angelo had also been in the SUV as a passenger. Detective Steele further testified that the defendant never admitted in either police interview that he (1) had ever planned a robbery that day, (2) knew a robbery was about to occur, (3) knew that anyone had a gun, or (4) had pointed out the victim to the group. Detective Steele testified that when he interviewed Mr. Raymond Pirtle during his investigation, Mr. Pirtle did not tell him that the defendant had told him and Kevin Buford Junior to commit a robbery and did not mention their having committed a robbery earlier in the day or having engaged in any scouting activities.

Finally, the State presented the testimony of Dr. Sandra Thomas, a forensic pathologist at the Davidson County Medical Examiner's Office, who was qualified as an expert in the field of forensic pathology. Dr. Thomas testified that she had reviewed a report of the autopsy that was performed on the victim by a colleague who had since moved out of state. Dr. Thomas stated that the victim had died of a single gunshot wound to the chest and that the bullet had pierced his heart, diaphragm, and spleen. Dr. Thomas stated that it would have taken the victim several minutes to die from this injury and that it would have been possible for him to move during this time.

Following this testimony, the State rested. The defense raised a motion for judgment of acquittal on the grounds that the proof of the elements of the offenses was entirely dependant on Mr. Pirtle's testimony, which was not reliable. The trial court denied this motion. The defendant was advised of and waived his right to testify in his own defense pursuant to the procedures described in *Momon v. State*, 18 S.W.3d 152, 162-64 (Tenn. 1999), and the defense rested without offering any proof.

Each side presented closing arguments. During the State's rebuttal argument, the defendant made two objections, which were overruled by the trial court. As the transcript provides:

[General Morante]: Now, let's talk some about Raymond Pirtle, because there isn't any question that he is at the center of this case. Let's talk about the deal. There is no deal. I have told Mr. Pirtle that if he testifies truthfully, not if he

makes me happy as [defense counsel] wants to make it sound, but if he testified truthfully I, the State, will consider that in determining if he will get some sort of reduced offer and I am here to tell you that that is exactly what I am going to do.

[Defense counsel objects and is overruled by the trial court.]

[General Morante]: I am here to tell you that he does not have a deal, but he was promised consideration and what that means is it will be considered, if in fact he testifies truthfully it will be considered in his favor and you know what? Sometimes we have to do that. It doesn't mean that the person who comes in here and testifies even if he testifies truthfully is going to walk, that is not what it means.

[Defense counsel]: Your honor, I am going to object to that.

[Trial Court]: You cannot get into what it is, but she can make an argument in rebuttle –

[Defense counsel]: Yes sir.

[Trial Court]: – to what you suggested, [defense counsel], and so continue on, please.

Following this interchange the prosecution finished its rebuttal without further objection.

The following day the trial court instructed the jury and the case was submitted. The jury deliberated for the remainder of that day, took a break for the evening, and returned to deliberate the following day. At 2:03 p.m. on February 12, 2008, the jury returned with a verdict on Count I of guilty of the lesser-included offense of facilitation to commit felony murder, and on Count II guilty as charged of attempted especially aggravated robbery.

The defendant was sentenced on March 12, 2010. At the sentencing hearing, the trial court heard testimony from Mr. Hugh Coleman, an investigator for the District Attorney's Office, who testified that he had researched the employment history of the defendant and was unable to locate any record of the defendant's having been employed. Ms. Vicki Choisser, the officer who had prepared the defendant's presentence report, also testified. Ms. Choisser testified that the defendant told her he had worked at a construction company called Triple J, but she had been unable to locate that company for purposes of verifying his employment. She further testified that the defendant claimed to have worked other places as well but

-18-

would not tell her when or where. On cross-examination, Ms. Choisser stated that in her experience there are many construction companies whose information is not readily available. In addition, the victim's brother, the victim's sister, and the victim's mother each testified as to the tremendous loss their family and the victim's children had suffered as a result of the victim's murder.

In response, the defendant called another one of his brothers, Mr. Rodney Buford, to testify on his behalf. Mr. Rodney Buford testified that the defendant had been whipped by his mother, his grandmother, and his step-dad when he was growing up. Mr. Rodney Buford testified that the defendant would cry during these spankings, which were sometimes administered with switches or belts. Mr. Rodney Buford also testified that the defendant had a different father from the other children in the family and was sometimes treated poorly or not permitted to attend family gatherings for this reason. In addition, the defendant was born with a defect in his leg and had always been self-conscious about his short height, suffering from something "sort of like the Neapolitan complex." The witness testified that the defendant was not a heartless person but that he never stood a chance growing up in such a dysfunctional family. He testified that he had been in prison himself for the last twenty-one years for felony murder. On cross-examination, the witness testified that he had not taught the defendant how to commit aggravated robberies and that robbery was not the family business.

The defendant also presented the testimony of Mr. Bobby Hancock, his biological father. Mr. Hancock testified that he was not involved in the defendant's life until the defendant was around twenty years old. He testified that the defendant came and visited him frequently and spoke about his work, including construction work and a job at a sports bar. He testified that the defendant was never unruly or disrespectful and seemed concerned that his children not follow in his footsteps.

Following this, the defendant made a statement in allocution. The defendant apologized to the family of the victim for the tragic accident and asked them to forgive him for his negligent and irresponsible actions. He told his family that he loved them. He stated that he did not feel that he should be held responsible as a facilitator of the crime – he did not feel that was just, and he requested that the court not use his past mistakes as a rope to bind him because he did not intend for any of the things that happened to occur. Following this testimony the court heard arguments from the parties.

The State argued that the defendant should be sentenced as a Range II offender. In addition, the State argued that numerous enhancement factors were applicable: (1) that the defendant had a history of criminal convictions beyond that necessary to establish his range; (2) that he was the leader of an offense involving two or more criminal actors; (3) that he had

no hesitation about committing a crime when the risk to human life was high; and (4) that he was an adult who provided an illegal drug to a minor. The State also requested consecutive sentencing on the grounds that (1) the defendant was a career criminal who had knowingly devoted his life to criminal acts as a major source of livelihood, and (2) the defendant was a dangerous offender whose behavior indicated little or no regard for human life.

The defense argued that the defendant should not be sentenced consecutively because he was found guilty of only facilitation of felony murder, and thus the State was essentially "asking that the same underlying felony that this individual was found guilty of facilitating be run consecutive to that facilitation of first degree murder." Concerning the enhancement factors suggested by the State, the defendant argued that his sentence could not be enhanced on the grounds that he had no hesitation about committing a crime when the risk to human life was high because the risk to human life posed by the defendant's acts was already inherent in the elements of the offenses of which he stood convicted. The defendant also submitted various mitigating factors but did not elaborate on these at the hearing.

After hearing the parties' arguments, the trial court summarized the evidence received at trial and at the sentencing hearing. The trial court rejected all but one of the defendant's proffered mitigating factors – including the factors involving playing a minor role in the commission of the offense and having steady employment. The trial court did find that the defendant came from a dysfunctional family and had an abusive background but gave this factor little weight in light of the defendant's age and the fact that the abuse had occurred so long ago. The trial court applied two enhancement factors. The trial court found that the defendant had a history of criminal convictions above that necessary to establish his range, stating that "[h]e has been getting charged and convicted of misdemeanors and felonies for over twenty years, just over and over." The trial court also found that the defendant was a leader in the commission of the offenses, based on the fact that he was twenty years older than the shooter and there was testimony that he had driven the younger individuals around. The trial court found that these two enhancement factors significantly outweighed the mitigating factors.

The trial court found that the defendant was a Range II offender and sentenced him to forty years – at the high end of his range – on his Class A felony conviction for facilitation of felony murder. The trial court sentenced him to the maximum sentence, twenty years, on his Class B attempted especially aggravated robbery conviction, stating that it was "unbelievable" that such a serious crime should be committed "over this little pack of cigarettes and just a few dollars." The trial court ordered these sentences to be served consecutively based on the fact that the defendant was a professional criminal as described in Tennessee Code Annotated section 40-35-115.

The defendant filed a timely motion for new trial raising numerous claims. The trial court issued an order denying the motion for a new trial on June 11, 2010. The defendant filed a timely notice of appeal on July 12, 2010. After carefully reviewing the parties' arguments and submissions, our decision follows.

## ANALYSIS

The defendant raises numerous challenges to his convictions and sentences. He claims that the evidence is insufficient to support his convictions. He claims that the trial court erred by failing to suppress the statements he made to police on the evening of the shooting because they were the fruits of an unlawful arrest. He claims that the trial court erred by permitting Mr. Pirtle to testify that the defendant and his co-defendants contemplated additional robberies and committed an additional robbery on the day of the shooting. He claims that the trial court erred by permitting the prosecutor to vouch for the credibility of Mr. Pirtle in closing arguments. He claims that the trial court erred by failing to merge his two convictions. Finally, he claims his overall sentence was excessive and raises a variety of challenges to his sentencing. We find each of these claims to be without merit.

## I.

The defendant claims that the evidence is insufficient to support his convictions for several different reasons. He claims that there is no proof in the record that establishes his *mens rea* with respect to his facilitation of felony murder conviction. Concerning his attempted especially aggravated robbery conviction, he claims that there is no evidence that he solicited, directed, aided, or attempted to aid another in the commission of that offense, as required to satisfy the relevant statute establishing his criminal responsibility for another's conduct. Finally, he claims that his convictions rest solely on the uncorroborated testimony of his accomplice, Mr. Pirtle. However, after carefully reviewing the record, we conclude that sufficient evidence was presented to support each of his convictions.

When a defendant challenges the sufficiency of the evidence to support his convictions, the ultimate question is "whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011); *see also* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). A jury's verdict of guilt strips the defendant of his presumption of innocence and raises a presumption of guilt. *Sisk*, 343 S.W.3d at 65. Because the jury is tasked with the primary responsibility of "assess[ing] the credibility of the witnesses . . . address[ing] the weight to be given their testimony, and . . . reconcil[ing] any conflicts in the proof," its decisions concerning these

matters will not be revisited on appeal. *Id.* "[T]he criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." *Id.* (*quoting State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). The defendant in this case has failed to meet that burden.

## A.

The defendant was convicted of facilitation of the commission of first degree (felony) murder. In order to be guilty of the crime of facilitation of a felony, the person must "knowingly furnish[] substantial assistance in the commission of the felony" to another while "knowing that [the individual] intends to commit [the] specific felony." T.C.A. § 39-11-403(a) (2008). Facilitation of a felony is punished one classification lower than the underlying felony. T.C.A. § 39-11-403(b). To commit facilitation, the individual need not possess the higer level of *mens rea* necessary to establish the greater culpability of direct criminal responsibility for the conduct of another, *viz.*, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." T.C.A. § 39-11-402(2).

The particular felony underlying this defendant's facilitation conviction, first degree (felony) murder, is defined as "[a] killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, act of terrorism, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect, rape of a child, aggravated rape of a child or aircraft piracy." T.C.A. § 39-13-202(a)(2). "No culpable mental state is required for conviction under subdivision (a)(2) . . . except the intent to commit the enumerated offenses or acts in those subdivisions." The particular offense that serves as the basis for the underlying felony murder charge is attempted especially aggravated robbery. A crime is attempted when an individual, "acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." T.C.A. § 39-12-101(c). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401. Robbery is aggravated if it is "accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon" or "the victim suffers serious bodily injury." T.C.A. § 39-13-402. Robbery is especially aggravated if it is "[a]ccomplished with a deadly weapon . . . and . . . the victim suffers serious bodily injury." T.C.A. § 39-13-403.

Thus, to establish that the defendant was guilty of facilitation of felony murder, the State was required to prove that the defendant knew that an individual intended to attempt to commit a robbery, that the defendant furnished substantial assistance to that individual, and that person was killed during the attempted perpetration of that robbery. There is ample evidence in the record to support each of these elements.

Standing alone, the testimony of Mr. Pirtle supports the jury's conclusion with respect to all of the necessary elements of the offense. With respect to the *actus reus* required by statute*,* Mr. Pirtle testified that the defendant drove him, the defendant's brother, and the defendant's two sons to an area near a car wash for purposes of attempting to rob an individual. The defendant's act of driving to the crime scene provided substantial assistance to the others in the performance of the attempted robbery. Moreover, Mr. Pirtle's testimony would support a conclusion by a reasonable jury that the defendant provided further assistance by planning the robbery, casing the area, and then acting as a lookout and getaway driver for the group.

Concerning *mens rea*, the jury was free to conclude that the defendant was aware that the individuals he was assisting intended to commit a robbery based on Mr. Pirtle's testimony that: (1) one of the defendant's sons cocked a gun while they were riding in the car; (2) the defendant drove the group to numerous locations looking for stores or individuals to rob; and (3) the defendant was present while the group had various discussions and arguments over potential targets along the way. Indeed, Mr. Pirtle's testimony might have sufficed to support a jury's conclusion that the defendant was guilty of the greater crime of felony murder as a principal – on the grounds of criminal responsibility for the conduct of another – in that Mr. Pirtle testified that the defendant additionally incited the group to commit robberies on several occasions, became angry when they failed to do so, and personally selected several of the group's targets and attempted targets. However, the jury was free to credit certain portions of Mr. Pirtle's testimony while rejecting others and apparently did so in this case.

Mr. Pirtle's testimony was corroborated in numerous respects by the testimony of other witnesses and forensic evidence. Witnesses in the area heard shots and saw the defendant's SUV leave the area of the shooting after three individuals jumped inside. The defendant himself acknowledged being at the crime scene and giving a ride to three individuals, two of whom were later identified as individuals who had fled the scene of the crime. Fingerprints from several of the suspects were found on or near the doors of defendant's SUV. All of this evidence supports the jury's conclusion that the defendant provided substantial assistance to individuals that he knew intended to attempt a robbery. Considered as a whole, the defendant has failed to carry his burden of showing that no reasonable jury could have found the essential elements of the offense of facilitation to commit felony murder beyond a reasonable doubt.

**B.**

The defendant also challenges his conviction of attempted especially aggravated robbery. However, the same evidence that supports his conviction for facilitation of felony murder also supports the jury's conclusion that he was guilty of attempted especially aggravated robbery on the grounds of criminally responsibility for the conduct of others. As discussed above, Mr. Pirtle's testimony supports a reasonable jury's conclusion that the defendant incited the group to commit robberies (and further became angry when they failed to follow his instructions) while providing them substantial assistance in the commission of the robberies by driving them to various locations and giving them advice. This would suffice to establish the defendant's responsibility for the criminal actions committed by the other members of the group.

Nonetheless, the defendant argues that the evidence is insufficient to establish that he committed attempted especially aggravated robbery on two different grounds. First, he claims that there is no evidence in the record establishing that Kevin Buford Junior attempted to rob the victim. In this regard, the defendant cites Mr. Pirtle's testimony given on cross-examination to the effect that he did not hear Kevin Buford Junior demand money from the victim, nor did he see the victim give Kevin Buford Junior any money. However, the absence of these specific pieces of potential evidence is of little significance in light of the considerable evidence, provided by Mr. Pirtle during his direct testimony, supporting a conclusion that he, Kevin Buford Junior, and the defendant intended to rob the victim on the day in question, and in fact attempted to do so. At most, these concessions made by Mr. Pirtle on cross-examination would suffice to raise a conflict between the inferences to be drawn from the evidence presented at trial – but an appellate court reviewing a sufficiency of the evidence claim may not revisit issues concerning the resolution of conflicts in the evidence or the inferences to be drawn from it, as these tasks remain exclusively the province of the jury. *Sisk*, 343 S.W.3d at 65. In any event, even if the defendant was correct in his contention that Kevin Buford Junior never demanded any money and the victim never gave anything of value to him, these facts do not disprove attempted robbery – they are consistent with a conclusion that a robbery was attempted but failed at an early stage.

The defendant's second argument is that there is no evidence establishing his *mens rea* with respect to the attempted robbery. In this regard, the defendant argues that the undisputed evidence showed that he was sitting across the street in his vehicle at the time the robbery occurred, and he argues that the law is clear that a defendant's mere presence in the area during the commission of a crime is insufficient to support a conviction under a theory of criminal responsibility – citing *State v. Sherman*, 266 S.W.3d 395, 408 (Tenn. 2008). However, the defendant's argument simply ignores all of the other evidence that was presented in this case (including the remainder of Mr. Pirtle's testimony), which supports a

conclusion that the defendant was not merely "in the area" but intended, planned, and incited the attempted robbery from start to finish – in addition to participating in the attempted robbery directly by driving the group to the crime scene and acting as a lookout and getaway driver.

The defendant also urges the evidence is insufficient to establish his *mens rea* because "the jury, by finding [the defendant] guilty of the lesser included offense of facilitation of felony murder in count 1, determined that he did not have the intent required for criminal responsibility." This argument must fail because it is based on an apparent inconsistency between the jury's verdicts on a multiple count indictment. Inconsistent jury verdicts are an accepted fact of our legal system and have never, standing alone, provided any legal basis for a challenging the sufficiency of the evidence used to convict a defendant. *See, e.g.*, *State v. Emmett LeJuan Harvell and Bardell Nelson Joseph*, No. M2009-01168-CCA-R3-CD, 2010 Tenn. Crim. App. LEXIS 1004, at ** 10-13 (Tenn. Crim. App. Nov. 29, 2010). As this court has explained:

> Consistency in verdicts for multiple count indictments is unnecessary as each count is a separate indictment. Therein lies the essential reasoning. An acquittal on one count cannot be considered res judicata to another count even though both counts stem from the same criminal transaction. This Court will not upset a seemingly inconsistent verdict by speculating as to the jury's reasoning if we are satisfied that the evidence establishes guilt of the offense upon which the conviction was returned.

*State v. Gennoe*, 851 S.W.2d 833, 836 (Tenn. Crim. App. 1992). Reviewing the record as a whole, the evidence amply supports a reasonable jury's conclusion that the defendant was guilty of attempted especially aggravated robbery.

## C.

Finally, the defendant challenges his conviction on the grounds that the evidence necessary to support the jury's conclusion that he had pre-existing knowledge that his co-defendants intended to attempt a robbery on the day in question consists solely of the uncorroborated and unreliable testimony of his accomplice, Mr. Pirtle. However, the corroboration requirement concerning accomplice testimony does not require corroboration with respect to each element of the offense charged. *See, e.g., Sherrill v. State*, 321 S.W.2d 811, 815 (Tenn. 1959) ("[C]orroboration need not of itself be adequate to support a conviction."). Rather, the longstanding rule is that corroborating evidence must only "connect, or tend to connect the defendant with the commission of the crime charged." *Id.* The corroborating evidence, taken by itself, must: (1) "lead[] to the inference . . . that a crime had been committed," and (2) "connect the defendant with the commission of the crime charged" by including "some fact establishing the defendant's identity." *State v. Bigbee*, 885

S.W.2d 797, 803 (Tenn. 1994). The corroborating evidence may be direct evidence or entirely circumstantial. *See Sherrill*, 321 S.W.2d at 815. Moreover, the evidence "need not be conclusive," and when considered by itself may be "slight and entitled . . . to but little consideration." *Bigbee*, 885 S.W.2d at 803.

After reviewing the record, we are satisfied that the State presented sufficient independent corroborating evidence for a reasonable jury to be able to infer that the crimes at issue were committed and that the defendant was connected to them. First, the State presented abundant direct and circumstantial evidence that an attempted especially aggravated robbery occurred – and that a felony murder also occurred when the victim died as a result of this attempt. Police investigators and medical personnel testified that they responded to a reported shooting on the night in question and found the victim unresponsive and bleeding on the ground. Spent bullet casings were found on the ground nearby, along with a twenty dollar bill and a lottery ticket. A videotape taken by a nearby surveillance camera shows an individual being followed by two individuals through a parking lot. A short time later, that tape shows the same individual returning before one of the two individuals attempts to grab him from behind and appears to shoot him as he tries to run away. By presenting this and other evidence, the State sufficiently corroborated Mr. Pirtle's testimony that the crimes at issue actually occurred.

Second, the State presented sufficient corroborating evidence linking the defendant to the crimes. In an interview with police, the defendant admitted that: (1) he had been the sole person in control of his SUV on the day in question; (2) he was present at the crime scene and was behind the wheel of his SUV at the time of the shooting; (3) he was aware that a shooting had occurred; and (4) he had given a ride to individuals who ran to his car after he heard the shots fired. Even absent his own statements, there was significant evidence linking this specific defendant to the crimes. Witnesses saw three individuals fleeing the scene of the shooting jump into an SUV, and one witness saw and recorded that SUV's license plate number. A computer search of that license plate number conducted by police revealed that the SUV was registered to the defendant. One witness was later able to identify two of the three individuals fleeing the scene from photo lineups. Fingerprints belonging to several individuals were found on the outside of the defendant's SUV by forensic examiners. All but one of the individuals whom witnesses identified as jumping into the defendant's SUV at the crime scene and/or whose fingerprints were found on the outside of the defendant's SUV on the day of the shooting were related to the defendant by blood. Although this evidence is circumstantial, all of it specifically identifies the defendant as an individual linked to the crimes. The law of concerning corroboration of accomplice testimony requires no more.

Because the evidence presented by the State raises an inference that the crimes

attested to by the defendant's accomplice in fact occurred and tends to connect the defendant to those crimes, the corroboration requirement is fully satisfied. The defendant's claim is therefore denied.

## II.

Next, the defendant claims that the trial court erred by failing to suppress the statements he made to police on the evening of the shooting. We disagree. A trial court's findings of fact at a suppression hearing are subject to deference and will be upheld on appeal unless the evidence preponderates against them. *See State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). A trial court's application of the law to the facts is reviewed *de novo*. *See State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001). Our review of the record leads us to the conclusion that the trial court correctly determined that the defendant's statements – which he intended to be exculpatory – were voluntary and were not obtained by exploitation of any illegal detention.

Both federal and state constitutions protect an individual's right to be free of unreasonable searches and seizures. *See* U.S. CONST. AMEND IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause. . . ."); CONSTITUTION OF TENNESSEE, Art. I, sec. 7 ("[P]eople shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures. . . ."). "[U]nder both the federal and state constitutions, a warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997).

"Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons'" for constitutional purposes. *Whren v. United States*, 517 U.S. 806, 809-810 (1996); *see also e.g. State v. Vineyard*, 958 S.W.2d at 730, 734 (Tenn. 1997) ("Without question, the temporary detention of individuals during the stop of a vehicle by police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' which implicates the protection of both the state and federal constitutional provisions."). However, if police have a reasonable suspicion that the individuals in the vehicle are armed or have committed or are about to commit an offense, the individuals may be temporarily detained by police in a manner consistent with constitutional strictures pursuant to the well-known "Terry" or "investigative" stop. *Terry v. Ohio*, 392 U.S. 1, 27 (1968); *see also State v. Simpson*, 968 S.W.2d 776, 780 (Tenn. 1998) ("[A]n investigatory stop is constitutionally permissible if the

-27-

officer has a reasonable suspicion, supported by specific and articulable facts, that a criminal offense has been or is about to be committed [and a] frisk is [permissible] if the police officer has a reasonable suspicion supported by specific and articulable facts that the suspect is armed."). The police in this case apparently intended their detention of the defendant to be justified pursuant to this exception to the warrant requirement.

However, the investigative stop afforded by *Terry* permits only the temporary detention of an individual for limited investigative purposes. While the precise boundaries of a lawful *Terry* stop may be (and often are) the subject of spirited debate, the trial court found that these boundaries were exceeded when the police transported the defendant to the police station and questioned him throughout the night and into the next morning. The State does not challenge this conclusion on appeal. The parties also agree that a full scale arrest must be supported by probable cause, *see, e.g., Brown v. Illinois*, 422 U.S. 590, 602 (1975); *State v. Daniel*, 12 S.W.3d 420, 424 (Tenn. 2000), and that the trial court correctly determined that the police did not have probable cause to arrest the defendant at whatever point during the evening his lawful investigative detention expanded into an unlawful arrest. Consequently, we will assume *arguendo* that his continued detention at the police station was rendered unlawful by the time he was questioned and that any evidence resulting from this illegal detention must be suppressed.

The crucial question therefore becomes whether the statements the defendant made to police at the station were evidence that resulted from his illegal arrest, *viz.*, whether his statements should be considered the "fruit of the poisonous tree," as described in the well-known doctrine articulated in *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963). "Under the 'fruit of the poisonous tree' analysis, the focus is on whether the evidence was obtained by exploitation of the Fourth Amendment illegality." *State v. Huddleston*, 924 S.W.2d 666, 674 (Tenn. 1996) (citing *Wong Sun*, 371 U.S. at 471 *et seq.*)). The overarching concern that must be addressed is "whether the [defendant's] statement was sufficiently an act of free will to purge the primary taint of the unlawful invasion." *Id.* (internal quotations omitted). In discerning the answer to this question, courts must consider four factors, collectively known as the *Brown* factors: "(1) the presence or absence of *Miranda* warnings; (2) the temporal proximity of the arrest and the confession; (3) the presence of intervening circumstances; and finally, of particular significance, (4) the purpose and flagrancy of the official misconduct." *Id.* at 674-75 (citing *Brown v. Illinois*, 422 U.S. 590, 603-604 (1975)).

After considering these factors, we agree with the trial court that suppression of the defendant's statements is not required because the taint of his unlawful detention was sufficiently attenuated by his exercise of free will when he made the statements to police. Consideration of the first three factors weighs slightly in favor of the State. The trial court found that the defendant was given his *Miranda* warnings twice – a finding to which we

defer on appeal. In addition, the trial court found that several hours passed between the defendant's arrest and his subsequent statements. Consequently, the defendant's statements were not made in close temporal proximity to his illegal arrest. On the other hand, there do not seem to have been any significant intervening circumstances between the time of the defendant's arrest and the time he was interviewed by police. The only event of any significance – the defendant's being taken to his house and waiting in a patrol car while it was searched – may not have actually been "intervening" (depending on the precise point in time that his detention became unlawful), and, in any event, is unlikely to lessen any taint stemming from an unlawful arrest. With the exception of that one event, the record reflects that the defendant was simply moved from place to place in a patrol car and taken to a police station. He remained in continuous police custody throughout this period and did not speak with anyone. Consequently, unlike the two prior factors, this factor would appear to weigh in favor of the defendant.

However, the most significant *Brown* factor – the flagrancy of the police misconduct at issue, *see Brown*, 422 U.S. at 604 – again cuts in favor of the State. It appears from the testimony contained in the record that the police never intended to arrest the defendant, but rather sought to merely detain him for purposes of performing a lawful investigative stop. The record supports the trial court's conclusion that the police were not attempting to secure a confession at the time of the defendant's detention and his subsequent interview. Unlike the illegal detention that led the United States Supreme Court to suppress a confession in *Brown* itself, where the "impropriety of the arrest was obvious," 422 U.S. at 605, this arrest simply resulted from a mistaken assumption on the part of the police – that they could constitutionally detain the defendant long enough to explore his connection to the individuals seen entering his SUV at the crime scene to their full and complete satisfaction. Such misconduct is not so flagrant as to compel suppression.

Consequently, a weighing of the *Brown* factors leads to the conclusion that the defendant's statements were sufficiently the product of his own free will so as to purge the taint of any illegal arrest. Moreover, in this case, the legal conclusion dictated by *Brown* is confirmed by the presence of additional facts. The record reflects that the defendant never requested to leave at any point during the time period he was in police custody. Furthermore, the statements that the defendant made to police were intended to be exculpatory. While the principle that exculpatory statements may be suppressed as fruits of the poisonous tree is a concept as old as the doctrine itself, *see Wong Sun*, 371 U.S. at 487 (rejecting the government's argument that certain statements should be admissible because they were ostensibly exculpatory), the overarching picture painted by this record is not one of a defendant coerced into making an involuntary confession – or indeed any sort of statement at all – to the police as a result of some pressure or trauma resulting from an illegal detention.

Because we conclude that the defendant's statements to police did not result from his illegal detention, we conclude that the trial court committed no error by allowing their admission. Consequently, we need not address the State's argument that any error committed by the trial court was harmless. The defendant's claim is denied.

### III.

The defendant claims that the trial court erred by allowing Mr. Pirtle to testify that the defendant and his co-defendants were involved in another robbery (that of "Little E," Mr. Pirtle's drug dealer) and contemplated numerous other additional robberies on the day of the shooting. However, we believe that the trial court was well within its discretion in permitting this testimony.

Generally, the "[a]dmission of evidence is entrusted to the sound discretion of the trial court, and a trial court's ruling on evidence will be disturbed only upon a clear showing of abuse of discretion." *State v. Robinson*, 146 S.W.3d 469, 490 (Tenn. 2004). A trial court abuses its discretion only if it applies the wrong legal standard or makes an illogical decision that causes injustice to the aggrieved party. *See id.* In this case, the defendant has failed to carry his burden of demonstrating that the trial court committed either form of error when it permitted Mr. Pirtle to testify concerning the entire course of criminal conduct committed by the defendant and his co-defendants on the day in question.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable," Tenn. R. Evid. 401, and, as a general rule, all relevant evidence is admissible unless a particular constitutional provision, statute, or rule excludes it, *see* Tenn. R. Evid. 402. A specific rule does prohibit the use of evidence that a defendant has committed other crimes or wrongs for the particular purpose of proving a defect in the defendant's character and actions in conformity therewith. *See* Tenn. R. Evid. 404(b). However, that same rule expressly provides that evidence of such prior bad acts "may . . . be admissible for other purposes," *id.*, and provides a procedure that trial courts must follow before admitting such evidence. Evidence concerning prior bad acts may not be admitted, regardless of its intended purpose, if "its probative value is outweighed by the danger of unfair prejudice." Tenn. R. Evid. 404(b)(4). The defendant has failed to establish that the trial court misapplied any of these rules or otherwise acted illogically when it denied his motion *in limine* concerning Mr. Pirtle's testimony.

The defendant does not allege that the trial court failed to follow the proper procedures prior to reaching its decision or that it applied incorrect legal standards in concluding that Mr. Pirtle's testimony was admissible. Rather, the defendant challenges only the trial court's conclusions: (1) that Mr. Pirtle's testimony was offered for the proper

purposes of proving the defendant's intent and for providing important contextual background to the crimes, and (2) that the probative value of his testimony outweighed the prejudice posed to the defendant. *See id.* However, we believe that the trial court's conclusions with respect to these issues were not illogical. To the contrary, these conclusions were fully supported by the record.

The law is well established that evidence concerning a defendant's prior bad acts may be admissible for purposes of proving the defendant's intent. *See State v. McCary*, 922 S.W.2d 511, 514 (Tenn. 1996). Absent Mr. Pirtle's testimony about the group's activities throughout the day, the jury might have been left with the erroneous impression that the three individuals who attempted to rob the victim had misinterpreted the defendant's words and actions in the minutes immediately preceding the robbery attempt or that the defendant's statement "now I got 15 minutes to do a robbery before I go and pick up my wife from work" was made purely in jest. When considered in light of Mr. Pirtle's testimony concerning the earlier robbery and attempted robberies, however, it becomes significantly more plausible that what otherwise might appear to be a dearth of specific instructions concerning this particular victim's robbery can be attributed to the fact that, by the time it occurred, each member of the group already knew what they intended to do and how they intended to do it.

Consequently, the trial court's conclusions concerning the relevance of Mr. Pirtle's testimony were not illogical. Neither was its decision regarding the relative weight of the probative value of this testimony in relation to its potential prejudice. The trial court acknowledged that Mr. Pirtle's testimony posed some risk of prejudice to the defendant but reasoned that this prejudicial effect could be limited by an appropriate jury instruction – an instruction that the trial court in fact provided. In contrast, the trial court found that the probative value of this evidence was extremely high, and for the reasons discussed above, our review of the record leads us to agree. The trial court's conclusion that the probative value of the Mr. Pirtle's testimony outweighed its potential for prejudice is both logical and supported by the record.

Because the defendant has failed to demonstrate that the trial court applied an incorrect legal standard or reached an illogical result, he has failed to demonstrate any abuse of discretion. His claim that the trial court erred by admitting Mr. Pirtle's testimony concerning the defendant's earlier robbery and attempted robberies on the day of the shooting is denied.

## IV.

The defendant claims that the trial court erred by permitting the prosecutor to improperly vouch for the credibility of Mr. Pirtle during closing argument. However, the

defendant failed to include this issue in his motion for a new trial. Pursuant to Tennessee Rule of Appellate Procedure 3(e), a defendant waives any issue relating to an "action committed or occurring during the trial . . . or other ground upon which a new trial is sought" unless the defendant raises such issue in a motion for a new trial. His claim is waived accordingly.

## V.

The defendant claims that the trial court erred by failing to merge his convictions for facilitation of felony murder and attempted especially aggravated robbery. He claims that separate convictions for both offenses violates his protections against double jeopardy as guaranteed by the Fifth Amendment of the United States Constitution ("[N]o person shall . . . be subject for the same offense to be twice put in jeopardy of life or limb."), as applied to the States through the Fourteenth Amendment, and Article I, section 10 of the Tennessee Constitution ("[N]o person shall, for the same offence, be twice put in jeopardy of life or limb."), on the grounds that his separate convictions act to impose multiple punishments for the same offense. In this regard, the defendant cites *State v. Denton*, 938 S.W.3d 373, 381 (Tenn. 1996), in which the Tennessee Supreme Court listed multiple factors for courts to consider in determining whether separate convictions violate double jeopardy principles. These factors included "an analysis . . . of the evidence used to prove the offenses," "whether there were multiple victims or discrete acts," and "a comparison of the purposes of the respective statutes." *Id.* The defendant urges that consideration of these factors compels the conclusion that his convictions should be merged because "the State used the same evidence to support the defendant's dual convictions," the offense involved "a single victim and a single discrete act," and "both the felony murder statute and the especially aggravated robbery statute have the same purpose."

However, after this case was submitted, the Tennessee Supreme Court decided *State v. Nigel Kavic Watkins*, No. M2009-00348-SC-R11-CD, 2012 Tenn. LEXIS 154, at *4 (Tenn. Mar. 9, 2012), and *State v. Lonnie Cross*, No. E2008-02792-SC-R11-CD, 2012 Tenn. LEXIS 155, at **15-22 (Tenn. March 9, 2012). In these cases, the Tennessee Supreme Court overruled *Denton* and adopted a straightforward *Blockburger* analysis for purposes of resolving "multiple description" double jeopardy claims (*i.e.* cases in which defendants have received multiple convictions under different statutes for the same discrete act). Under the *Blockburger* test, courts must compare the statutory elements of the offenses at issue in order to determine whether merger is required if the offenses involve the same transaction or occurrence. *See Blockburger v. United States*, 284 U.S. 299, 303-05 (1932). As the *Blockberger* court explained, if a defendant's single act or transaction potentially violates two different statutes, "the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Id.* at 304.

-32-

"The *Blockburger* test requires an examination of the statutory elements in the abstract, without regard to the proof offered at trial in support of the offenses." *Watkins*, 2012 Tenn. LEXIS 154, at *34. If "each statutory offense includes an element not contained in the other, the offenses are distinct." *Id.* at *38. "Where the offenses are distinct under *Blockburger*, the legislature is presumed to have intended to allow the offenses to be punished separately," and federal and state double jeopardy protections are not violated. *Id.*

The defendant concedes that facilitation of felony murder and attempted especially aggravated robbery involve different elements and constitute distinct offenses under the *Blockburger* test. Consequently, it is presumed that the legislature intended to allow the offenses to be punished separately. While the *Blockburger* presumption "may be overcome by explicit declarations of legislative intent," *id.* at *39, the legislature has made no such express declaration with respect to the crimes at issue. To the contrary, the legislature's act of passing separate statutes criminalizing felony murder, criminal attempt, and especially aggravated robbery appears to be indicative of a desire to punish attempted thefts involving violence separately and distinctly from any death resulting from such attempts. Consequently, the defendant's claim that the trial court erred by failing to merge his convictions is denied.

## VI.

The trial court sentenced the defendant as a Range II, multiple offender to forty years for his facilitation of felony murder conviction and to a consecutive twenty years for his attempted especially aggravated robbery conviction. The defendant claims that the trial court erred by finding him to be a Range II offender, by imposing an excessive sentence with respect to each count, and by ordering the sentences to be served consecutively. For reasons discussed more fully below, after reviewing the record, we conclude that the trial court committed an error in the sentencing process that compels this court to engage in a *de novo* review of the defendant's sentences. However, after conducting the requisite *de novo* review, we conclude that the sentences imposed by the trial court were appropriate. Moreover, we find no error in the trial court's decision to order the defendant's sentences to be served consecutively. The defendant's claims are denied accordingly.

The burden of demonstrating that a sentence is erroneous is placed upon the appealing party. *State v. Carter*, 254 S.W.3d 335, 344 (Tenn. 2008). "When a sentence is challenged, 'the appellate court shall conduct a *de novo* review on the record of the issues . . . with a presumption that the determinations made by the court from which the appeal is taken are correct.'" *Cross*, 2012 Tenn LEXIS 155, at *33 (*quoting* T.C.A. § 40-35-401(d); § 40-35-402(d)). The presumption that the sentencing court's factual determinations are correct "'is conditioned upon the affirmative showing in the record that the trial court considered the

sentencing principles and all relevant facts and circumstances.'" *Carter*, 254 S.W.3d at 344-45 (quoting *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991)). If "the trial court applies inappropriate mitigating and/or enhancement factors or otherwise fails to follow the Sentencing Act, the presumption of correctness fails," and our review becomes simply *de novo*. *Id*. at 345.

## A.

The defendant claims that the trial court erred by sentencing him as a Range II, multiple offender. In response, the State concedes that the trial court applied an incorrect legal standard in determining the defendant's sentencing range. Although Tennessee Code Annotated section 40-35-106(c) requires a sentencing court to determine that the defendant is a multiple offender "beyond a reasonable doubt" before sentencing him in Range II, the trial court's written sentencing order states that the court found that the State had proved that the defendant had been previously convicted of the two requisite felony convictions – aggravated robbery and aggravated assault – "by a preponderance of the evidence." Because the trial court cited the incorrect legal standard in determining the defendant's sentencing range, we review the defendant's sentences *de novo* with no presumption of correctness. However, our *de novo* review of the record leads us to conclude beyond a reasonable doubt that the defendant is a Range II, multiple offender, by virtue of having three prior qualifying felony convictions.

The state of the record concerning these convictions is slightly unusual. The transcript of the sentencing hearing reflects that the State produced certified copies of three prior felony convictions – two aggravated robberies and an aggravated assault – and displayed them to opposing counsel and the trial court. Defense counsel examined these judgments, after which the parties argued over issues such as whether the defendant's two aggravated robbery convictions could be counted separately if they occurred within twenty-four hours of each other. When the trial court informed counsel to proceed with the hearing, defense counsel reminded the court that the State had the burden of proving the defendant's range beyond a reasonable doubt, but the issue of the defendant's range was not revisited until the court passed sentence. During sentencing, the transcript reveals that the trial court considered the three convictions, stating that the defendant "has had two prior aggravated robberies" and "based on what I heard with these three convictions . . . this man is in range two." The trial court's written sentencing order also expressly references these convictions, stating that the trial court found that the defendant was a Range II, multiple offender, because the State had demonstrated "that the Defendant has two prior convictions for Aggravated Robbery and one prior conviction for Aggravated Assault."

However, the State apparently failed to enter certified copies of these prior

convictions into evidence, and thus they were not initially part of the record on appeal. When the defendant brought this fact to the State's attention in his opening brief, the State promptly filed a motion in the trial court to supplement the record with certified copies of the defendant's convictions. The trial court granted this motion by written order on June 1, 2011, explaining that "[t]his Court finds that the State did present copies of these convictions at the sentencing hearing but failed to move them into evidence" and "[t]he Court did consider these judgments in sentencing and they are properly included in the record." This court accepted the supplemental record from the trial court on June 13, 2011.

The certified copies contained in the supplemental record bear the defendant's name and reflect that the defendant was convicted of aggravated assault, a Class C felony, on June 4, 2004, and two counts of aggravated robbery, Class B felonies, on January 1, 2000. These certified copies serve as *prima facie* evidence that the defendant was convicted of the listed offenses, *see* T.C.A. § 40-35-202(a), and the defendant has not attempted to rebut this presumption.

A defendant qualifies as a Range II, multiple offender, if, *inter alia*, the court finds beyond a reasonable doubt that he has received "[a] minimum of two (2) but not more than four (4) prior felony convictions within the conviction class, a higher class, or within the next two (2) lower felony classes. . . ." T.C.A. § 40-35-106(a)(1). The defendant's facilitation of felony murder conviction is a Class A felony, and his attempted especially aggravated robbery conviction is a Class B felony. Consequently, two prior convictions for Class C felonies or above suffice to establish the defendant's status as a Range II, multiple offender with respect to both offenses.

This Court finds that the certified copies of the defendant's two prior Class B aggravated robbery convictions and his prior Class C aggravated assault conviction, which are now contained in the record, provide sufficient evidence to qualify the defendant as a Range II, multiple offender beyond a reasonable doubt. In so concluding, we note that the defendant argued before the trial court that his two aggravated robbery convictions should count as a single conviction because they were committed in the same twenty-four hour period. *See* T.C.A. 40-35-106(b)(4) ("[C]onvictions for multiple felonies committed within the same twenty-four-hour period constitute one (1) conviction for the purpose of determining prior convictions."). However, this court has repeatedly held that convictions for aggravated robbery are exempted from this rule. *E.g., State v. Valentino L. Dyer*, No. E2010-02578-CCA-R3-CD, 2011 Tenn. Crim. App. LEXIS 755, at **30-31 (Tenn. Crim. App. Oct. 6, 2011); *State v. Elmi Abdulahi Abdi*, No. M2009-01614-CCA-R3-CD, 2010 Tenn. Crim. App. LEXIS 653, at **15-16 (Tenn. Crim. App. July 29, 2010). As this court has explained, the general rule aggregating felonies committed within the same twenty-four-

hour period provides an express exception for "convictions for which the statutory elements include serious bodily injury, bodily injury, threatened serious bodily injury or threatened bodily injury to the victim or victims. . . ." *Id.* Convictions for aggravated robbery, even when based on the defendant's use of a seemingly deadly weapon (rather than on the defendant's infliction of serious bodily injury on the victim, *see* T.C.A. § 39-13-402), encompass the requisite statutory elements and fall within this exception because the defendant's use of such a weapon to commit theft by placing a person in fear (as required to commit robbery, *see* T.C.A. § 39-13-401) inherently threatens the victim with, and places the victim in fear of, bodily injury.

Of course, even if this exception applied to the defendant's two aggravated robbery convictions, the certified copies contained in the record would still reflect the defendant's conviction of a Class B aggravated robbery and a Class C aggravated assault, and only two qualifying felonies are required to establish the defendant's status as a Range II, multiple offender. Consequently, the defendant would be entitled to no relief.

**B.**

Next, the defendant challenges his sentence on each count as excessive. In this regard, the defendant argues that the trial court erred in its findings concerning various enhancement and mitigation factors. However, after considering the record in this case, the appropriate sentencing principles, the enhancement and mitigating factors, the nature of the criminal conduct at issue, the defendant's potential for rehabilitation, and the other factors mandated by statute, we believe that the sentences imposed by the trial court were appropriate and were not excessive. *See* T.C.A. §§ 40-35-102; 40-35-103; 40-34-210(b). We observe that the sentences imposed by the trial court were within the appropriate sentencing range. A Range II offender convicted of a Class A felony may be sentenced to twenty-five to forty years, *see* T.C.A. § 40-35-112(b)(1), and the defendant was sentenced to forty years. A Range II offender convicted of a Class B felony may be sentenced to twelve to twenty years, *see* T.C.A. § 40-35-112(b)(2), and the defendant was sentenced to twenty years. Consequently, his sentence was not excessive in relation the legislature's determination of what constitutes an appropriate range of punishment for an individual with his criminal background who commits such grave criminal behavior.

**C.**

The defendant also challenges the trial court's judgment that he should serve his sentences consecutively. "Whether sentences are to be served concurrently or consecutively is primarily within the discretion of the trial court." *State v. Dorantes*, 331 S.W.3d 370, 392 (Tenn. 2011). A trial court may order sentences to be served consecutively if, *inter alia*, the

court determines by a preponderance of the evidence that "[t]he defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood" or "[t]he defendant is an offender whose record of criminal activity is extensive." T.C.A. §§ 40-35-115(b)(1), 40-35-115(b)(2). In this case, the trial court found both factors to be applicable.

In support of its finding that the defendant was a professional criminal, the trial court cited the defendant's extensive criminal history, his lack of any proof of employment, and his use of his sons and family members to commit armed robberies. The defendant challenges these facts as insufficient, urging that the State failed to present proof that he lived on the illegal proceeds of his criminal behavior. We disagree. Although not cited by the trial court at sentencing, there was evidence presented at trial that the defendant required the proceeds of his illegal activities to meet his basic life needs and desires. Mr. Pirtle testified that on the day of the shooting the defendant told the group that he could not afford to buy gasoline for a return trip home unless the group committed a robbery; that they " did not have enough gas money to make it back to where we stayed at." In addition, at the defendant's sentencing hearing, the defendant's half-brother testified that he and his brothers "didn't have money" and "would try to . . . sneak off, steal things [and] try to make money just to go buy clothing that we would like . . . stylish clothing. . . ." At that same hearing, the defendant's biological father testified that the defendant "could not keep a good job." We conclude that this and other evidence in the record amply suffices to support the trial court's conclusion that the defendant was a professional criminal who had devoted his life to criminal acts as a major source of income.

Even had the trial court erred in finding that the defendant was a professional criminal, the trial court also found that the defendant had an extensive criminal record, and the defendant does not challenge this finding on appeal. The record amply supports the trial court's conclusion. In addition to the prior felony convictions discussed above, the defendant has numerous prior misdemeanor convictions, including multiple theft convictions and convictions for resisting arrest, assault, escape, shoplifting, possession of unlawful drug paraphernalia, and vandalism. The defendant has been convicted of at least one crime almost every year of his life since he turned eighteen, with the exception of years when he was incarcerated. The defendant's extensive criminal record standing alone would fully suffice to support the trial court's decision to impose consecutive sentences.

Considering the defendant's sentencing as a whole, we concur with the trial court's assessment that a sixty year effective sentence "is the least severe measure necessary" to "protect society by restraining a defendant [with] a long history of criminal conduct" and to "avoid depreciating the seriousness of the offense[s]." T.C.A. §§ 40-35-103(1), 40-35-103(4). Consequently, the defendant's claim that the trial court erred by imposing

consecutive sentences is denied, as is his claim that each sentence is excessive.

## CONCLUSION

For the foregoing reasons, the judgments of the trial court are affirmed.


_____
JOHN EVERETT WILLIAMS, JUDGE